# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **DENNIS E. ZIMMERMAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 10-CV-084-PJC** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Claimant, Dennis E. Zimmerman, ("Zimmerman"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Zimmerman's applications for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the Parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Zimmerman appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Zimmerman was not disabled. For the reasons discussed below, the Court REVERSES AND REMANDS the Commissioner's decision.

## Claimant's Background

Zimmerman was born on December 31, 1963 and was almost 45 years old at the time of the December 9, 2008 hearing. (R. 71). He has completed the eighth grade. (R. 33). He can read and write, but has difficulty with math. (R. 33-34). The date Zimmerman was last insured was December 31, 2007. (R. 28-29). Zimmerman testified that his employment as a truck

driver ended because "it was too rough" on his back. (R. 29, 33, 42).

Zimmerman stated that he started to experience back problems in 1998 which progressively increased over time. (R. 35). In 2004, his back problems made sitting difficult which eventually began to interfere with his ability to work. *Id*. Zimmerman additionally experienced a loss of feeling in his left leg and was unable to bear weight on the leg or walk. *Id*. He underwent back surgery in May 2005 to repair three breaks in L5 and an impinged nerve. *Id*. Since his surgery, he has felt constant numbness in his left leg and had a loss of strength in the leg. (R. 35-36). He additionally has experienced difficulty in bending. (R. 39).

Zimmerman testified that doctors at Oklahoma Neck, Back and Spine Specialists advised his back was "beyond help" for any additional surgery. (R. 36). His symptoms were treated with medication for pain, muscle relaxation, blood pressure, and antacid relief. *Id*. He testified his pain was no longer completely relieved by medication. (R. 37). Zimmerman experienced symptoms of somnolence due to medication side effects. *Id*.

In an average day, Zimmerman helps his wife care for their children, cares for their animals, and does some household chores and yard work. (R. 38-40). Zimmerman testified that he is able to do yard work without bending only about 30 minutes a day and after that has to lie down for "anywhere from three to four hours." (R. 39-40). In an average week Zimmerman drives approximately 200 miles to and from his children's school, doctor appointments, and the grocery store. (R. 40-41). He can shop for approximately 40 minutes before he has to sit down. (R. 41). Math difficulties occasionally cause him problems in making change at the store. (R. 34). For enjoyment, Zimmerman enjoys making weekly backyard campfires with his family. (R. 42). He is no longer able to enjoy riding dirt bikes and horses. *Id.*

Activity increases the level of Zimmerman's pain. (R. 38-40). He takes a break after approximately thirty to forty minutes of activity to relieve his pain. *Id.* Between activities, he spends up to four hours intermittently lying in bed and sitting recumbent in a chair to relieve his pain. *Id.* Zimmerman also experiences discomfort after a period of time lying on his back and sitting. *Id.* Pain wakes him at night requiring him to get up and walk around. (R. 37). Zimmerman testified he is only able to walk for approximately thirty minutes before he needs to sit down and can sit for 20-30 minutes before he needs to stand up and move around. (R. 39).

Doctors at the Sam Hinder Jay Community Clinic (the "Clinic") provided Zimmerman medication management from 2003 through 2008. (R. 125-64, 188-214, 276-291, 304-51). During those years he maintained almost monthly appointments with the Clinic. *Id.* It appears that Dominic Totani, D.O., was generally his treating physician at the Clinic.

Zimmerman presented to the Clinic on October 22, 2003 for symptoms of numbness, weakness, and tingling sensation in his left leg. (R. 126). He reported that he felt numbness 90% of the time with radiation from his mid back and hip to his knee. *Id.* Zimmerman was given back stretches to do and advised to not keep his wallet in his left pocket. *Id.*

Zimmerman presented at the Clinic on March 17, 2004 with back pain, depression, insomnia, allergies, and migraines. (R. 164). He was treated with medication for his symptoms and provided refills of the same on April 6, 2004 for continued symptoms. (R. 162). At his May 24, 2004 appointment, Zimmerman continued to have problems with low back spasms, GERD and asthma. (R.156). His symptoms were again treated with medication. *Id.*

During his June 28, 2004 appointment at the Clinic, Zimmerman reported he experienced difficulty sleeping due to apnea and a restless leg. (R. 151). His doctor diagnosed him with

insomnia, asthma, and GERD.  *Id.*   Zimmerman was provided medication refills for back spasms and pain on August 2, 2004.  (R.  147-48).

On August 9, 2004, Zimmerman reported that he did not feel like getting out of bed most days and felt fatigued.  (R. 146).  His doctor diagnosed him with depression and hypertension. *Id.*

Zimmerman was diagnosed with major depressive disorder on  September 1, 2004.  (R. 145).  Zimmerman reported that he slept three to four hours daily.  *Id.*  Paxil and Restoril were prescribed to treat Zimmerman's depression and insomnia.  *Id.*  At his return appointment on September 8, 2004, he reported improvement of depressive symptoms due to the medication.  (R. 144).

Zimmerman reported low back pain from moving furniture and a migraine during his October 25, 2004 appointment at the Clinic and was prescribed Ibuprofen.  (R.  140).

Zimmerman reported to the Clinic with complaints of mid-thigh pain, muscle spasms and numbness in his right leg on December 9, 2004.  (R.  137).  He was diagnosed with muscle spasms, uncontrolled hypertension, cephalgia and depression and provided refills of his medications.  *Id.*  Zimmerman complained of continued symptoms during his January 24, 2005 appointment.  (R.  214).  He additionally reported symptoms of insomnia.  *Id.*  Zimmerman's symptoms were again treated with medications.  *Id.*

Zimmerman was seen on April 7, 2005 at the Clinic reporting a three-month gradual increase of low back pain.  (R.  209-10).  Zimmerman described his pain as radiating from his low back into his left knee, with an itchy, burning, numb and weak sensation.  (R.  209). Palpation of the L4 area produced Zimmerman "exquisite" pain.  (R.  210).  His pain was

exacerbated with back extension, bending sideways, rotation and prolonged standing. (R. 209-10). The pain was relieved when lying down. *Id.*

On April 12, 2005, Zimmerman reported that he had increased back pain that kept him from sitting, walking or lying down. (R. 208). Notes reflect his pain was so great that he was unable to attend welding school. *Id.* On examination, Zimmerman's pain was located at L4-L5 area. *Id.* Zimmerman was prescribed Hydrocodone and Flexeril. *Id.*

Medical records note that Zimmerman had a MRI scan of his lumbar spine on April 4, 2005 which showed "an annular tear with a small left paracentral disk protrusion at L5-S1 causing displacement of the central left S1 nerve root," as well as spondylolisthesis.[1] (R. 167).

Zimmerman presented on a "walk-in" basis at the Clinic on April 18, 2005 requesting pain medication in order to return to school. (R. 206). He was provided a prescription for his chronic back pain. *Id.* Notes reflect that he phoned the Clinic on April 21, 2005 seeking MRI test results to provide his school in order to take a leave of absence. (R. 205).

Zimmerman reported continued lower back pain that radiated down his left side towards his foot and numbness in his left thigh during a April 25, 2005 appointment at the Clinic. (R. 204). His medications were continued and he was referred to Dr. Frank Letcher for a neurological evaluation. *Id.*

Zimmerman was seen by Dr. Letcher on May 4, 2005. (R. 167-69). Zimmerman was described as having a five year history of low back pain that had developed over time into pain that radiated down his left leg. (R. 167). Zimmerman described his low back pain as a knife

---

[1] The Record does not contain the test report. The results were noted in Dr. Frank Letcher's hospital note of May 24, 2005 (R. 167).

cutting into his back that worsened with any activity and advised that he had constant left leg numbness along with an  itchy and burning sensation.  *Id.*  Zimmerman also reported weakness in his left lower leg.  *Id.*  On examination, Dr. Letcher described Zimmerman as "in obvious pain."  (R.  168).  He observed that Zimmerman walked with a pronounced limp on his left side, had difficulty standing on his toes on his left side, and his right straight leg test produced pain in his left hip at 60 degrees.  *Id.*  Dr. Letcher noted that low back and left hip pain stopped Zimmerman from being able to anteflex past 30 degrees.  *Id.*

Per Dr. Letcher's orders, Zimmerman underwent a lumbar spine myleogram and spinal CT scan on May 10, 2005 which showed that  Zimmerman had "bilateral spondylolysis at L5 with spondylolisthesis L5-S1 with segmental instability with a herniated disk on the left impinging on both the L5 and the S1 nerve roots."  (R. 167, 181-83).  Dr. Letcher recommended Zimmerman undergo a decompressive laminectomy, diskectomy and pedicle screw fusion.  (R. 167).

Dr. Letcher performed a decompression and stabilization of L5-S1 on Zimmerman at Hillcrest Hospital on May 24, 2005.  (R.  165-79).  Zimmerman was discharged the following day with instructions on wound care and limitations on activity. (R.  165-66).

Zimmerman reported he experienced muscle spasms and insomnia during his July 21, 2005 appointment at the Clinic. (R. 198).  Zimmerman was prescribed Darvocet and referred for follow-up with Dr. Letcher.  *Id.*

Zimmerman presented to the Clinic on October 12, 2005 worried that "something came loose" in his surgery hardware.  (R.  192).  An x-ray showed Zimmerman's L5 spine fusion to be

intact and in place.[2]  *Id.*  Zimmerman was diagnosed with back pain, insomnia, hypertension, and smoking cessation.  *Id.*  He was provided Darvocet and ibuprofen for his pain.  *Id.*

Zimmerman requested a Darvocet refill on November 1, 2005, which was denied.  (R. 191).  Zimmerman then went to the Clinic on November 9, 2005 reporting that he was "in lots of pain" and Ibuprofen was not effective.  (R. 190).  He was given a refill of Darvocet then and again on his December 13, 2005 visit to the Clinic for his back pain. (189-90).

Per Dr. Totani's referral, Zimmerman was examined by Ronald E. Woosley, M.D., on March 8, 2006 for chronic back pain.  (R. 234-36).  Zimmerman reported he had suffered from a five-year history of low back pain and had approximately eight weeks of relief subsequent to Dr. Letcher's 2005 decompression and stabilization procedure, but now had a recurrence of knifelike low back pain that radiated into both gluteal areas and legs, though greater on the left side.  (R. 234-35).  He reported numbness in both feet with his left leg weaker with a constant itchy, burning numbness, and he easily lost his balance and tripped due to leg weakness.  (R. 235).  Zimmerman said his pain worsened with standing, walking, and driving.  *Id.*  Twisting and extension movements further exacerbated  Zimmerman's level of pain and he was unable to put on his socks.  *Id.*  Zimmerman stated that he experienced significant pain although he was taking Darvocet, Naproxen and ibuprofen.  *Id.*  Dr. Woosley ordered thoracic and lumbar myleogram studies for further evaluation.

After Woosley's physical examination of Zimmerman and review of the March 31, 2006 thoracic and lumbar myleogram studies, he recommended that Zimmerman's treatment continue

---

[2] Impressions of Zimmerman's July 25, 2005, October 24, 2005, and November 7, 2005 lumbar spine x-rays showed no evidence of hardware failure or interval change from his prior fusion procedure at L5-S1.  (R. 223-230).

to be conservative; *i.e.*, referral to a pain physician for epidural steroid injections and if this treatment failed, consideration of removal of the hardware. (R. 215-22, 233). He noted that the myleogram studies showed "no significant abnormalities that might elucidate the source of his pain"; Zimmerman had "post surgical changes without evidence of nerve root compression or arachnoiditis"; and although there were some degenerative changes, "his hardware seems to be in a good position." (R. 233).

George T. Conrad, M.D., at the Clinic authored "To Whom It May Concern" letters dated March 10, 2006, April 20, 2006, and June 28, 2006, regarding Zimmerman's physical condition. (R. 237-38, 240). Dr. Conrad stated that Zimmerman suffered chronic pain and disability from degenerative disc disease of the spine "for which he has had surgery with placement of Harrington rods, which are titanium metal rods placed to maintain the integrity of the lumbar spine." (R. 238, 240). Dr. Conrad further stated:

> Mr. Zimmerman is in the office requesting a statement on his work tolerance. He relates that he can mow his lawn, which takes about two hours with breaks every fifteen minutes or so due to his back pain and leg numbness. He is able to stand about fifteen minutes at a time. He can lift and hold his youngest child, who weighs around 34 pounds for only a few minutes. His work capacity at this time seems fairly limited, even sitting more than thirty minutes causes numbness to develop in his legs.

(R. 237). In responding to the agency's "Treating Physician Mental Functional Assessment Questionnaire" on August 11, 2006, Dr. Conrad opined that Zimmerman had no mental limitations. (R. 282).

Dr. Woosley authored a April 12, 2006 note stating that Zimmerman had chronic pain syndrome, that "studies do not reveal source of pain" and that Zimmerman was "unable to work due to pain." (R. 239).

On January 13, 2006 and February 10, 2006, Zimmerman reported to the Clinic with back pain, asthma, and hypertension. (R. 290-91). In February, he reported the return of chronic pain at the surgical site, weakness in his left lower extremity, numbness in his toes, and the onset of paresthesia. (R. 290). He continued to be medicated with Darvocet and Restoril. *Id*.

Zimmerman reported his symptoms were unchanged during his monthly follow-up appointments at the Clinic through June 28, 2006. (R. 283-89). He continued to receive pain medication for chronic back pain, along with medications for continued symptoms of hypertension, GERD and insomnia. *Id*.

During Zimmerman's September 15, 2006 and October 19, 2006 appointments at the Clinic, he again complained of numbness and tingling sensation in his left thigh. (R. 280-81). He additionally reported that he was unable to sit, stand, or walk over 30 minutes duration, had to lie down to relieve his symptoms, and nearly fell when his leg gave out from under him. *Id*.

On November 24, 2006, Zimmerman presented to the emergency room at Siloam Springs with complaints of head and low back pain. (R. 261-71). He described severe, sharp, stabbing headache, along with neck pain, and intermittent blurred vision. (R. 262). He rated the level of his head pain as seven out of a ten. *Id*. The CT scan showed no acute intracranial process and he was released with a diagnosis of uncontrolled hypertension. (R. 263, 266).

Zimmerman continued his monthly visits at the Clinic on January 18, 2007 for evaluation and management of chronic low back pain, GERD, insomnia, and hypertension. (R. 277). Zimmerman reported compliance with Dr. Woosley's instruction for home physical therapy exercises. (R. 277) He felt the exercises were beneficial as he was determined to return to

employment as a truck driver. *Id.*

At his Clinic visit on February 16, 2007, Zimmerman reported that he had fallen on the ice three weeks before but that Darvocet was providing adequate pain control. (R. 276). He stated that he was able to do up to 10 minutes of exercise before feeling pain and was able to do light duty work up to 30 minutes before he had back pain and spasms. *Id.* He was again diagnosed with chronic low back pain, chronic insomnia, and GERD, but he newly reported apnea and depression with suicidal ideation. *Id.*

Zimmerman was treated at the Clinic on March 15, 2007 for "hypertensive urgency," depression, and continued lower back muscle spasms. (R. 340). He was continued on his pain medications and prescribed Zoloft for depression. An April 3, 2008 abdominal x-ray confirmed Zimmerman had atherosclerotic vascular disease. (R. 342).

During Zimmerman's monthly appointments at the Clinic on April 16, 2007, May 16, 2007, and June 20, 2007, he was treated for chronic low back pain/failed back syndrome, depression, insomnia, hypertension, and asthma. (R. 333, 336, 338). Zimmerman reported Zoloft helped with symptoms of depression. (R. 338).

On July 16, 2007, Zimmerman requested pain and sleep medications because he had participated in his children's summer camp activities, including horseback riding and swimming. (R. 331). Zimmerman rated the level of his pain as six out of ten. *Id.* He was prescribed Ambien and Darvocet for sleep and pain.

The August 15, 2007, and September 10, 2007, Clinic records note that Zimmerman called in for pain and sleep medication for continued symptoms of chronic low back pain/failed back syndrome as he had returned to work driving a truck. (R. 325-29). When he returned to

the Clinic on October 15, 2007, he reported that he was employed driving a truck and doing well. (R. 324).

At his November 29, 2007,  December 27, 2007, and January 14, 2008 appointments at the Clinic, Zimmerman reported he experienced lumbar disc pain due to two falls and experienced bilateral shooting pain in his extremities. (R. 318-22).  He stated his "back muscles locked up" and that he experienced muscle spasms and a tingling sensation in his left leg on certain movement.  (R. 318).

On January 30, 2008, Zimmerman called in requesting more pain medication as his pain had progressively worsened.  (R. 317).  Zimmerman advised at his February 27, 2008 appointment that he had fallen a lot lately and had persistent lumbar pain and sensation of "needles" in his thigh.  (R. 315).  His symptoms were treated with medications.  *Id*.  The April 2008 Clinic record notes diagnoses of chronic low back pain, soft tissue contusion, hypertension, and GERD.  (R. 311-14).  Zimmerman was prescribed pain medication refills May through June 2008.  (R. 307-10). At his July 8, 2008 visit to the Clinic, Zimmerman complained of increased back pain from carrying his son and from sleeping on a cot when he was camping.  (R. 305).

A lumbar spine x-ray on June 3, 2008 showed the bilateral pedicle screws at L5-S1 and evidence of associated anterior inter-body fusion at that level with minimal degenerative lumbar spine changes.  (R. 377).

On September 6, 2006, a DDS non-examining physician submitted a Physical Residual Functional Capacity Assessment (hereafter, the "9/6/06 PRFCA").  (R. 252,  253-60).  The doctor assessed that Zimmerman was able to frequently carry 10 pounds (though lift only 5 pounds), stand and/or walk at least 2 hours in an 8-hour work day, and sit about 6 hours in an 8-

hour day. (R. 254). Zimmerman had no limitation in pushing and/or pulling and had no manipulative, visual, or communicative limitations, though he was limited to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. 255-57). The DDS doctor placed a complete restriction from working hazards (machinery and heights, etc.) due to Zimmerman's use of narcotic medications. (R. 257). In support of these findings, the doctor noted marked decrease in Zimmerman's ADLs due to lifting, walking, climbing, balance and weakness limitations; his leg numbness if sitting more than 30 minutes; his low back pain since 2002; Dr. Woosley's March 8, 2006 report of Zimmerman's restricted range of motion and deep tendon reflexes of 2+ and his final consultation note that the hardware may be the source of pain; no neurological root compression; some degenerative disc and joint disease in the CT/myleogram; and minimal encroachment upon the thecal sac. (R. 254-55).

Per a March 29, 2007 agency reviewer's request, Zimmerman underwent a consulting examination on April 27, 2007, by physician Shasbi Husain, M.D., of Tulsa Neurology and Headache Clinic, Inc. regarding his back pain. (R. 292-94). Dr. Husain observed that Zimmerman was able to dress and undress without problem, walked with a broad-based gait, could not walk on his toes or heels, but could walk in a tandem gait. (R. 293). Noting that Zimmerman had been in the emergency room in January and February 2006 due to back pain, the 2005 myleogram recommended by Dr. Woosley showed "nonspecific mild broad based disc bulge at L3-4 and no evidence of any recurrent disc herniation," and Dr. Woosley had recommended conservative treatment, Dr. Husain determined that Zimmerman's back pain was "most likely due to musculoskeletal strain" and "should be treated conservatively with medication." (R. 294).

A subsequent Residual Functional Capacity ("RFC") assessment on May 30, 2007 by a DDS non-examining physician found that Zimmerman was occasionally able to lift and/or carry ten pounds, could frequently lift and/or carry five to ten pounds, could stand and/or walk at least two to three hours in an eight-hour work day, and could sit for about six hours in an eight-hour day. (R. 297). The physician further concluded that Zimmerman had unlimited ability to push and/or pull, and could frequently climb, balance, kneel, crouch, and crawl, though only occasionally stoop. (R. 298). In support of his conclusion that Zimmerman's pain did not affect the RFC, the doctor noted that the Clinic examinations on October 19, 2006 and January 18, 2007 showed that Zimmerman had 4/5 strength in his left leg, decreased range of motion in his lower back and no DTR losses, and Dr. Husain's April 27, 2007 examination reported negative straight-leg raising, no strength deficits, DTRs of 2+ and broad based gait. (R. 298)

Zimmerman was seen by Richard Tidwell, M.D. ("Tidwell") from June 3, 2008 to November 19, 2008. (R. 352-77). He first presented complaining of chronic low back pain that was "constant, sharp, and throbbing," weakness of the legs, and myalgias. (R. 359). Dr. Tidwell ordered x-rays and refill of Darvocet after receiving a signed "pain contract/pharmacy lock" insuring that Zimmerman would not be receiving any Darvocet from the Clinic. (R. 360, 364). Dr. Tidwell's notes on June 10, 14 and 29, 2008 state that three different neurosurgeons would not agree to take Zimmerman as a patient. (R. 361-63).

On July 23, 2008, Tidwell examined Zimmerman and filled out an agency RFC questionnaire regard Zimmerman's ability to work. (R. 357, 373-75). The record contains a poor photocopy of the form and is mostly illegible. However, in the legible portion of the form, Dr. Tidwell marked that Zimmerman was limited in the use of both his hands and feet for

repetitive movements, could never bend, squat, crawl or climb and only occasionally reach; was totally restricted from unprotected heights; and markedly restricted from being around moving machinery, marked changes in temperature and humidity, dust, fumes and gases, driving and vibrations. (R. 374). Dr. Tidwell noted that the presence of a scar of Zimmerman's back along with a lumbar x-ray that evidenced post-operative and degenerative changes supported Zimmerman's allegations of pain and numbness. (R. 375).

Dr. Tidwell noted Zimmerman had a fair prognosis due to low back pain in a lumbar spine RFC dated September 2, 2008. (R. 368-72). He characterized Zimmerman's lower back pain as severe, sharp, and shooting. (368). He additionally reported Zimmerman suffered insomnia and impaired sleep secondary to pain and muscle spasms. (R. 368-69). Dr. Tidwell marked the following positive objective signs of Zimmerman's pain: abnormal gait, tenderness, muscle spasm and impaired sleep. (R. 369). He opined that emotional factors contributed to Zimmerman's symptoms and functional limitations and his pain would frequently interfere with his ability to work. (R. 369). Dr. Tidwell additionally found that Zimmerman's work would be interrupted by the side effects of his medications. *Id*. He concluded that Zimmerman could walk less than one city block without rest or severe pain and sit and stand only 45 minutes at a time and about two hours total in an eight-hour workday; needed to walk every 60 minutes for 10 minutes; required a job that permitted shifting positions at will; would need to take unscheduled breaks 3-4 times/day for an average of 30 minutes before returning to work; could rarely lift or carry ten or less pounds and crouch; could never twist, stoop or bend, climb ladders or stairs; and did not have significant limitations with reaching, handling or fingering. (R. 369-71).

In his December 2, 2008 RFC assessment, Dr. Tidwell reported that Zimmerman's

prognosis for his chronic low back pain and hypertension was poor. (R. 379). He noted that Zimmerman's pain radiated from his lumbar area down both his extremities as evidenced by positive straight leg raising on the left at 120 degrees and on the right at 160 degrees, abnormal gait, tenderness, muscle spasms and weakness, and impaired sleep. (R. 379-80). Dr. Tidwell opined that Zimmerman's impairments would likely produce "good days" and "bad days" and the resulting pain would constantly interfere with the attention and concentration needed to perform even simple work tasks. (R. 380, 382). He opined that no emotional factors contributed to Zimmerman's symptoms and functional limitations. (R. 380). Dr. Tidwell again found that Zimmerman's work would be interrupted by side effects of his medications and that Zimmerman could walk less than one city block without rest or severe pain. *Id.* However, he now found that Zimmerman could sit only 20 minutes and stand only 5 minutes at a time and sit and stand less than 2 hours total in an eight-hour workday; needed to walk every 15 minutes for 5 minutes; required a job that permits shifting positions at will; would need to take unscheduled breaks every 20-30 minutes for an average of 5-10 minutes before returning to work; could rarely lift or carry 10 or less pounds and climb stairs, and never twist, stoop or bend, crouch or squat; and had significant limitations with reaching. (R. 381-82). Dr. Tidwell opined that on average, Zimmerman would be absent from work 4 or more days/month. (R. 382). In support of these conclusions, Dr. Tidwell cited the Clinic findings from Zimmerman's March 31, 2006 lumbar spine CT and myleogram and his June 3, 2008 x-ray that showed post operative changes. (R. 379).

## Procedural History

Zimmerman protectively filed applications on May 6, 2005 seeking supplemental

security income ("SSI") and disability insurance benefits ("DIB"). (R. 16, 27, 71, 388). The applications were denied initially and on reconsideration. (R. 48-49, 53-55, 384-87). A hearing was held on December 9, 2008 in Miami, Oklahoma before ALJ Deborah L. Rose. (R. 24-47). By decision dated January 20, 2009, the ALJ found that Zimmerman was not disabled. (R. 16-22). On December 22, 2009, the Appeals Council denied review of the ALJ's findings. (R. 5-8). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[3]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education,

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

At Step One, the ALJ found that Zimmerman had met the insured status requirements through March 31, 2007 and had not engaged in any substantial gainful activity since April 1, 2002, the alleged onset date. (R. 18). At Steps Two and Three, the ALJ found that Zimmerman had severe impairments of degenerative disk disease of the lumbar spine and status post L-5-S1 fusion (2005), but did not meet a listing, specifically Listing §1.04. *Id*. The ALJ determined that Zimmerman had the RFC to do a full range of sedentary work with the limitation of occasional

work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

stooping.  (R.  19).  At Step Four, the ALJ found that Zimmerman was unable to perform his past

relevant work as a heavy level truck driver.  (R.  21).  However, at Step Five, the ALJ found that

there were unskilled sedentary jobs that Zimmerman could perform, taking into account his age,

education, work experience, and RFC; specifically, semiconductor assembler (DOT 726.685-

066) and clerical mailer (DOT 209.587-010)  *Id.*  Accordingly, the ALJ found that Zimmerman

was not disabled from April 1, 2002 through the date of the decision.  (R.  22).

**Review**

Zimmerman presents the following errors for review: (1) the ALJ failed to perform a

proper evaluation of medical sources, including Zimmerman's treating physician's opinions; (2)

the ALJ failed to include all his impairments at Step Five; and (3) the ALJ failed to perform a

proper credibility determination.

**Medical Source Opinion Evidence**

In evaluating the claimant's RFC, the ALJ must always consider and address  medical

source statements.  Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, *4.  "Medical

source statements are medical opinions submitted by acceptable medical sources, including

treating sources and consultative examiners, about what an individual can still do despite a

severe impairment(s), in particular about an individual's physical or mental abilities to perform

work-related activities on a sustained basis," and are "based on the medical sources' records and

examination of the individual; i.e., their personal knowledge of the individual."  *Id.*  The

medical opinions of treating physicians concerning the nature and severity of a claimant's

impairment(s), in particular, are entitled to "special significance," whether or not they are

accorded controlling weight.[4] *Id.*

The ALJ's assessment of the RFC must include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" and a "discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." Social Security Ruling ("SSR") 96-8p, 1996 WL 374183, *7.

The ALJ acknowledged Dr. Conrad's statements that Zimmerman was able "to stand for only 15 minutes" and "needed to break often while mowing his lawn so his back pain could gain relief" and Dr. Tidwell's opinion "that the claimant was restricted to such an extent he would be basically unable to perform even sedentary work."[5] (R. 19-20). She nonetheless stated that she

---

[4] The regulations specify that the treating physician has a "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(d)(2), 416.925(d)(2). "The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003)(citation omitted).

[5] The ALJ described Dr. Tidwell's "specifics about Mr. Zimmerman's physical limitations" as follows:

> Citing the claimant's sharp low back pain, Dr. Tidwell indicated Mr. Zimmerman could walk for less than one block. In an 8-hour workday, he could be expected to be able to stand-walk or sit for about 2 hours. Every hour, he could be expected to need to walk for 10 minutes. It was predicted that he would need to have a job that allowed shifting positions at will from sitting, standing, or walking. Lifting capacity was placed at 10 pounds rarely. Mr. Zimmerman was prohibited from ever bending, squatting, crawling, or climbing. Reaching was occasional. He was to remain clear of unprotected heights and moving machinery. Later, in a second questionnaire dated December 2, 2008, Dr. Tidwell reduced the claimant's capacities for standing/walking and sitting to less than 2 hours. In the same form, he estimated that Mr. Zimmerman would lose more than four days of work each month because of his impairments or the treatment for them.

(R. 20) (record citations omitted).

-19-

gave "less weight" to their opinions and that of Dr. Woosley because "their own records fail to show objective findings of such severity as to support their opinions." (R. 20).

> Dr. Tidwell provided an opinion that the claimant was restricted to such an extent he would be basically unable to perform even sedentary work, yet the claimant's own account of his activities of daily living are more consistent with the work functions of sedentary work. He continues to mow his lawn, taking about 2 hours to perform, with breaks about every 15 minutes. Although the claimant did undergo a fusion, no further surgery has been recommended and there is no evidence of a recurrent herniated disc or spinal narrowing or neural encroachment.

(R. 20). She gave the "greatest weight to the medical source opinion provided by the physicians at the Disability Determination Service in their Residual Functional Capacity Assessment," the 9/6/06 PRFCA.

The Court finds several problems with the ALJ's analysis of medical source opinions and reliance thereon in determining the RFC and in presenting the hypothetical to the VE.

Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Sections 404.1527(d) and 416.927(d). *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight she assigns to a treating physician opinion, and if she rejects the opinion completely, then she must give specific legitimate reasons for that rejection. *Id.*

When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

Here the ALJ included accurate summaries of the opinions of treating physicians Drs. Conrad and Tidwell. However, the only reason for giving "less weight" to Dr. Conrad's opinion is her conclusory statement that his records failed to show "objective findings of such severity" to support his opinion. She provided no analysis of Zimmerman's lengthy medical history at the Clinic or the basis for Dr. Conrad's opinion. Therefore, in rejecting Dr. Conrad's opinion, she failed to be "sufficiently specific to enable [the court] to meaningfully review [her] findings." *Langley*, 373 F.3d at 1122-23. And although she did provide some reasons for rejecting Dr. Tidwell's opinion of Zimmerman's physical restrictions, those reasons are not entirely accurate or complete. First, the ALJ cites one statement apparently from Dr. Conrad's June 28, 2006 letter that Zimmerman "continues to mow his law, taking about 2 hours to perform, with breaks about every 15 minutes"[6] as evidence that Zimmerman's own account of his ADLs were "more consistent with the work functions of sedentary work." (R. 20). However, she ignores Zimmerman's testimony that he is able to do yard work for only about 30 minutes a day and after doing that yard work has to lie down for "anywhere from three to four hours." (R. 39-40). The ALJ also cites as evidence that Dr. Tidwell's opinion should be rejected the fact that "no further surgery has been recommended." (R. 20). However, Dr. Woosley noted that although Zimmerman's "hardware seems to be in a good position," if epidural steroid injections failed to abate his pain, removal of the hardware should be considered. (R. 233). Further, the record

---

[6] Dr. Conrad's complete statement is noted *supra* in the section on Claimant's Background.

contains Dr. Tidwell's opinion that Zimmerman's inability to work due to back pain may improve if he were able to have a surgical repair, Zimmerman's testimony that the doctors at Oklahoma Neck, Back and Spine Specialists advised that his back was "beyond help," and medical records noting that three neurosurgeons refused to take him as a patient. (R. 373, 36, 361-63).

Even if the ALJ had given specific, legitimate reasons for not giving the treating physicians' opinions controlling weight, she failed to consider the factors set forth in 20 C.F.R. §§404.1527(d) and 416.927(d) to determine what weight they should be given:

> [T]he ALJ must consider the following specific factors to determine what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995).   Notably wanting from the decision is any acknowledgment of the lengthy longitudinal history of Zimmerman's almost monthly visits to the Clinic from 2003 through 2008, specifically the visits prior to Dr. Conrad's March, April and June 2006 opinions.

**Reliance on the 9/6/06 PRFCA**

Zimmerman contends that the ALJ erred in giving "greatest weight" to the 9/6/06 PRFCA yet determining that Zimmerman's only postural limitation was "occasional stooping" in her RFC and hypothetical to the VE when the DDS physician found that Zimmerman was not only limited to occasional stooping but also occasional climbing, balancing, kneeling, crouching

and crawling. (R. 20, 255). The Commissioner contends this failure is of no consequence because these postural activities are performed no more than occasionally according to the definition of sedentary work which the ALJ determined Zimmerman was able to perform. He cites SSR 83-10 as describing sedentary work as that which is "performed while seated with occasional walking/standing to obtain or return small articles."[7] *Response Brief* at 6-7 (Dkt. #16).

Actually, the Commissioner's description of sedentary work in SSR 83-10 refers to exertional activities ("primary strength activities"), not the non-exertional postural limitations on climbing, balancing, kneeling, stooping, crouching, and crawling. *See* SSR 83-10, 1983 WL31251,*6 (Nonexertional impairments include "impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel crouch, crawl, reach, handle, and use of the fingers for fine activities."). Certainly, in relying on this PRFCA in determining Zimmerman's RFC[8] and in setting forth the hypothetical to the VE, the ALJ should have

---

[7] SSR 83-10 defines "sedentary work"
. . .as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
SSR 83-10, 1983 WL 31251,*5.

[8] In assessing the claimant's physical RFC, the ALJ must look to the claimant's capability for "the physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)." 20 C.F.R. §§ 404.1545(b), 416.945(b).

included all of the postural limitations noted therein.[9]

**Credibility**

Zimmerman argues that the Commissioner failed to perform a proper credibility determination in failing to consider Zimmerman's constant and consistent complaints of pain to his doctors over time, his need for medication, including narcotics for pain, and in failing to consider all the evidence concerning his ADLs.  The Court agrees.

The ALJ must set forth "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186, *4.  When determining the credibility of testimony about pain and other symptoms, the ALJ is to consider factors such as the levels of medication and its effectiveness, the extensiveness of attempts to obtain relief, the frequency of medical contacts, the nature of daily activities, the motivation of and relationship between the claimant and other witnesses, and the consistency of nonmedical testimony with objective medical evidence. *Kepler v. Chater*, 68 F.3d 387, 390-91 (10th Cir.1993).

The ALJ found that Zimmerman's  "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's RFC finding]" based on the following:

> Neither the findings from Dr. Tidwell nor Dr. Conrad support the claimant's allegations of disabling pain.  The CT evidence fails to establish nerve root

---

[9] Further, the Court notes that someone who "may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting,"
> is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

SSR 83-12, 1983 WL 31253, *4.

compromise or arachnoiditis. Mr. Zimmerman spoke during his testimony of performing yard work, driving and shopping. His activities of daily living, particularly his driving around 200 miles a week, are more active than would generally be expected of someone experiencing disabling pain.

(R. 20).

Notably missing from the ALJ's credibility finding is any discussion of Zimmerman's long medical history of taking narcotics for his back pain and the side effects of this medication. Neither did the ALJ mention the DDS physician's finding in the 9/6/06 PRFCA, to which she gave "greatest weight," that Zimmerman must avoid all exposure to environmental hazards (machinery, heights, etc.) because he "utilizes narcotic analgesics." (R. 257). Nor did she address the extensiveness of Zimmerman's attempts to obtain relief from his pain and the frequency of medical visits which occurred virtually monthly for over five years. Finally, although she notes that Zimmerman testified "of performing yard work, driving and shopping," she ignored that he testified he is able to do yard work only about 30 minutes a day and after doing so has to lie down for "anywhere from three to four hours"; he can only sit for 20-30 minutes before he needs to stand up and move around (driving 200 miles a week is not necessarily inconsistent with this testimony); and he can shop no more than 40 minutes before he has to sit down. (R. 39-41). In sum, the ALJ failed to perform an adequate credibility analysis.

## Conclusion

For the reasons stated above, the Court reverses the decision of the Commissioner and remands for further proceedings consistent with this Opinion and Order.

Dated, this 13th day of May, 2011.

Paul J. Cleary
United States Magistrate Judge